**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| BETH HELGERSON, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| YORK HOSPITAL | ) | |
| | ) | |
| Defendant | ) | |

**COMPLAINT**
**JURY TRIAL REQUESTED**
<u>**INJUNCTIVE RELIEF REQUESTED**</u>

The Plaintiff, Beth Helgerson, M.D. ("Dr. Helgerson"), by and through undersigned counsel, complains against Defendant York Hospital as follows:

1. Dr. Helgerson, a licensed physician who specializes in obstetrics and gynecology, is a citizen of the State of Minnesota.

2. The Defendant York Hospital is a non-profit corporation organized under the laws of the State of Maine, with its principal place of business in York, Maine.

3. Because the Plaintiff and Defendant are citizens of different states, and the matter in controversy exceeds seventy-five thousand dollars, exclusive of interest and costs, this Court has jurisdiction of the action pursuant to 28 U.S.C. §1332.

4. Because the events giving rise to the action occurred in York County, in the State of Maine, venue is properly laid in the District of Maine pursuant to 28 U.S.C. §1391.

5. Jud Knox is the President and CEO of York Hospital. Accordingly, all the actions taken by him, and described below, occurred within the course and scope of his employment by York Hospital, and are legally imputed to York Hospital.

6. In 2018 Dr. Helgerson entered into an Independent Physician Agreement (IPA) with Medicus Medical Staffing, a true copy of which is attached hereto as Exhibit A.

7. Pursuant to the terms of the IPA, Dr. Helgerson accepted an assignment to work at York Hospital in a locum tenens capacity, for the period from October 23, 2018 through the end of February 2019.

8. Dr. Helgerson did start work at York Hospital on October 23, 2018, as agreed.

9. Dr. Helgerson was on call over the weekend of November 3-4, 2018.

10. On two separate occasions over the weekend of November 3-4, 2018, while Dr. Helgerson was delivering babies after failed home births, family members and friends of the patients filled the rooms where Dr. Helgerson was providing care and interfered with physician-patient communication.

11. During the first birth, two spectators loudly urged the patient to refuse Dr. Helgerson's efforts to provide necessary medical care.

12. During the second birth, Dr. Helgerson requested that all spectators leave the room while the delivery was occurring, but they did not.

13. The involvement and interference of spectators at both deliveries caused Dr. Helgerson to be genuinely concerned for the safety of the environment and the well-being of her patients.

14. On November 5 or 6, 2018, Dr. Helgerson had a conversation with Dr. Robert Cervenka, a physician employed by York Hospital, in which she expressed her concern about the fact that York Hospital did not provide a surgical assistant for a C-Section.

15. Dr. Helgerson shared with Dr. Cervenka her view that in an obese patient, the lack of an assistant can be dangerous, as visualization of the surgical field can be difficult.

16. Dr. Helgerson informed Dr. Cervenka that an obese patient presenting to York Hospital after a failed home birth might be better served in a larger facility with more surgical personnel, and that as a physician she might exercise her right to decline such a patient in the future, due to insufficient personnel.

17. On November 6, 2018, Dr. Helgerson convened a debriefing meeting, which was attended by members of the nursing staff and the hospital's risk manager, to address the safety issues she had observed during the deliveries that had occurred over the preceding weekend.

18. During this meeting Dr. Helgerson voiced her strong concerns regarding the many family and friends in the rooms of the patients with the failed home births, explaining that she felt there was interference with the doctor/patient relationship, which posed a danger to the patient.

19. During the same meeting Dr. Helgerson further stated that she believed she had the right to do what she could to create a safe work space, and that would include asking spectators to leave the room at decision points.

20. In response to the concerns raised by Dr. Helgerson, the OB charge nurse stated "Jud isn't going to like this."  As discussion continued, she again stated "Jud really isn't going to like this."

21. In response to the fear of "Jud" voiced by the OB charge nurse, Dr. Helgerson reiterated that medical decisions concerning the safety of her patients were to be made by her, rather than by a hospital administrator.

22. During the November 6, 2018 debriefing meeting, York Hospital's Risk Manager told Dr. Helgerson that if she wished to remove spectators from a patient's room, she would need to contact the "administrator on call"; and, further, that if Dr. Helgerson objected to that limitation on her ability to control the environment of care, the matter would have to be taken up more formally with hospital administration.

23. Dr. Helgerson responded by telling the Risk Manager that she did wish to have her comments relayed to hospital administration, to be considered as notification of her objection to York Hospital's rule placing an important patient safety decision in the hands of administrators, rather than doctors.

24. On November 8, 2018, Dr. Helgerson was summoned to a meeting with Mr. Knox, which took take place the following day.

25. During the November 9, 2018 meeting, Mr. Knox informed Dr. Helgerson that he had received several complaints about her, that York Hospital was terminating its relationship with her, and that she had no further patient care responsibilities.

26. Mr. Knox made the decision to terminate Dr. Helgerson's assignment because she had reported to York Hospital her good-faith, objectively-reasonable concern about the safety of the patient care environment at York Hospital.

27. Mr. Knox later informed Medicus that Dr. Helgerson's assignment had been terminated with cause, because York Hospital "had concerns for the safety and well-

being of [its] patients," and because Dr. Helgerson "displayed inappropriate conduct to [York Hospital] staff."

28. Mr. Knox did not, in fact, have good-faith, objectively reasonable concerns about either Dr. Helgerson's clinical abilities or her professionalism.

29. Dr. Helgerson had developed good working relationships with several people she had collaborated with during her brief time at York Hospital, including the anesthesiologist, the OR crew, some of the Labor & Delivery nurses, and the Health Unit Coordinator, and she had received positive feedback concerning her work.

30. All the deliveries performed by Dr. Helgerson at York Hospital had resulted in healthy mothers and healthy babies, and she had received statements of thanks from her laboring patients.

31. The real reason Dr. Helgerson was dismissed from York Hospital after three weeks, instead of being allowed to complete the four-month assignment for which she had been hired, is that she had reported her concerns about serious threats to patient safety, and had informed York Hospital that she may refuse to accept patients under unsafe conditions.

32. Dr. Helgerson's report to York Hospital involved safety concerns which were objectively reasonable.

33. Dr. Helgerson filed a charge of discrimination with the Maine Human Rights Commission, alleging that her termination violated the Maine Whistleblower Protection Act.

34. In response to the charge of discrimination, York Hospital asserted that Dr. Helgerson's assignment was terminated because she was not capable of performing a type of surgery she was expected to perform; because she had expressed dissatisfaction with her orientation; because she had "disparaged" some unnamed people; and because some nurses had registered concerns about her interpersonal interactions and her management of deliveries.

35. In response to the charge of discrimination, and in a separate submission to the Maine Board of Licensure in Medicine, York Hospital also provided inconsistent and in some respects false explanations for the termination of Dr. Helgerson's assignment.

36. Each of the reasons given by York Hospital was a pretext for a decision which was actually motivated by Jud Knox's desire to retaliate against Dr. Helgerson for her report of unsafe conditions, and for her refusal to participate in unsafe patient care.

37. On November 21, 2019, the Maine Human Rights Commission issued to Dr. Helgerson a Notice of Right to Sue, terminating the Commission process with respect to the charge of discrimination she had filed.

## COUNT I
### Violation of the
### Maine Whistleblowers Protection Act

38. The Plaintiff repeats and realleges the facts set forth in paragraphs 1 through 37, above, as though set forth in full herein.

39. The termination of Dr. Helgerson's assignment violated 26 M.R.S.A. 833 (1)(A), because it was in retaliation for her reporting in good faith what she had reasonable

cause to believe were practices that put at risk the health and safety of York Hospital patients.

40. The termination of Dr. Helgerson's assignment violated 26 M.R.S.A. 833 (1)(E), because it was in retaliation for her reporting what she had reasonable cause to believe were practices that constituted deviations from the standard of patient care.

41. As a result of York Hospital's violation of the Maine Whistleblowers Protection Act, Dr. Helgerson lost the income she would have earned by working at York Hospital from November 10, 2018 through the end of February, 2019.

42. As a result of York Hospital's violation of the Maine Whistleblowers Protection Act, Dr. Helgerson suffered emotional distress and consequential economic injury.

43. York Hospital's violation of the Maine Whistleblowers Protection Act was malicious.

   WHEREFORE, Dr. Helgerson prays for judgment awarding the following relief:

   a. An injunction mandating that York Hospital (i) inform Medicus that the termination of her assignment was "without cause," and (ii) pay Medicus the sums it would have become obligated to pay if it had not prematurely and wrongfully terminated her assignment;

   b. Compensatory damages in an amount sufficient to compensate her for her lost income, her emotional distress, and her consequential economic injury;

   c. Punitive damages in an amount sufficient to deter York Hospital and other similarly-situated employers from engaging in similar conduct;

   d. A reasonable attorneys' fee; and

    e. Her costs of court.

## COUNT II
### Interference with Contract

44. The Plaintiff repeats and realleges the facts set forth in paragraphs 1 through 43, above, as though set forth in full herein.

45. Under the terms of the Independent Physician Agreement between Dr. Helgerson and Medicus Medical Staffing, if a Provider cancelled an assignment of Dr. Helgerson prior to the expiration of the Assignment Term "with cause" – that is, "due to concerns over the quality of services rendered by, or the professionalism of," Dr. Helgerson – then Dr. Helgerson would be entitled to none of the compensation she otherwise would have earned for the uncompleted portion of the Assignment Term.

46. The Independent Contractor Agreement further stipulated, however, that if a Provider cancelled an assignment of Dr. Helgerson prior to the expiration of the Assignment Term "without cause," then Medicus would be liable to pay her an amount equal to the amount that would otherwise have become due for the uncompleted portion of the Assignment Term, up to a maximum of 60 days, subject to Medicus's receipt of the same payment from the Provider.

47. If York Hospital had accurately informed Medicus of the true reason for the premature cancellation of Dr. Helgerson's assignment – reasons which had nothing to do with genuine concerns about her clinical competence or professionalism – then

Medicus would have become obligated to pay Dr. Helgerson an amount equal to the amount that would otherwise have become due for the uncompleted portion of the Assignment Term, up to a maximum of 60 days.

48. Jud Knox, acting on behalf of York Hospital, falsely and fraudulently characterized the reasons for the premature cancellation of Dr. Helgerson's assignment – informing Medicus that it was justified by the institution's "concerns for the safety and well-being of [its] patients," and by Dr. Helgerson's "inappropriate conduct," when in fact it was not – in order to avoid York Hospital's liability to Medicus, and Medicus's liability to Dr. Helgerson.

49. As a direct result of Mr. Knox's false and fraudulent characterization of the reasons for the premature cancellation of Dr. Helgerson's assignment, Medicus was relieved of the contractual obligation it otherwise would have had to pay Dr. Helgerson for the uncompleted portion of the Assignment Term, up to a maximum of 60 days.

50. As a result of York Hospital's intentional interference in the contract between Dr. Helgerson and Medicus, Dr. Helgerson suffered emotional distress.

51. York Hospital's interference with Dr. Helgerson's rights under her contract with Medicus was malicious.

   WHEREFORE, Dr. Helgerson prays for judgment awarding the following relief:

   a. An injunction mandating that York Hospital (i) inform Medicus that the termination of her assignment was "without cause," and (ii) pay Medicus the sums it would have become obligated to pay if it had not prematurely and wrongfully terminated her assignment;

b. Compensatory damages in an amount sufficient to compensate her for her lost income, her emotional distress, and her consequential economic injury;

c. Punitive damages in an amount sufficient to deter York Hospital and other similarly-situated employers from engaging in similar conduct; and

d. Her costs of court.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury on all the issues so triable.

Dated at Portland, Maine this 28th day of January, 2020.

NORMAN, HANSON & DeTROY, LLC


/s/ Christopher C. Taintor, Esq
Attorney for Plaintiff Beth Helgerson


Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
(ctaintor@nhdlaw.com)